IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE:  E. I. DU PONT DE NEMOURS AND COMPANY C-8 PERSONAL INJURY LITIGATION | CASE NO. 2:13-md-2433 |
| | JUDGE EDMUND A. SARGUS, JR. |
| | MAGISTRATE JUDGE ELIZABETH P. DEAVERS |
| This document relates to: | *Ian Lynn and Heather Lynn v. E. I. du Pont de Nemours and Company, et al., Case No. 1:22-cv-00751-EAS-EPD* |
| | *Joseph Hall and Donna Hall v. E. I. du Pont de Nemours and Company, et al., Case No. 2:23-cv-00869-EAS-EPD* |

**DEFENDANT E. I. DU PONT DE NEMOURS AND COMPANY'S MOTION TO EXCLUDE THE SPECIFIC CAUSATION TESTIMONY OF DR. KAMAL POHAR**

Defendant E. I. Du Pont de Nemours and Company ("DuPont") respectfully requests that the Court preclude Plaintiffs Ian Lynn and Joseph Hall from introducing at trial the unreliable testimony of Dr. Kamal Pohar regarding specific causation.  Dr. Pohar's opinions in these cases contradict his prior testimony in this MDL, as he now claims—despite a lack of scientific evidence and without regard to this Court's decision in Evidentiary Motions Order ("EMO") 1—that C-8 acted synergistically with germ cell neoplasia in situ ("GCNIS") to cause germ cell testicular cancer in these cases.  Dr. Pohar also fails to properly account for and rule out GCNIS as a *causal* risk factor for Mr. Hall's and Mr. Lynn's germ cell testicular cancer.  Because Dr. Pohar's opinions fail to satisfy the recently heightened standards of Federal Rule of Evidence 702 or *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny, DuPont respectfully requests that this Court exercise its gatekeeping function to strike these opinions and preclude Dr. Pohar from opining on specific causation at trial.

Dated: April 9, 2024

Respectfully submitted,

/s/ Jesse L. Taylor
Jesse L. Taylor (0088209) (Trial Attorney)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700
Fax: (614) 365-2499
jesse.taylor@squirepb.com

John A. Burlingame (admitted *pro hac vice*)
Katy A. Spicer (admitted *pro hac vice*)
Meghan A. Quinn (admitted *pro hac vice*)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street NW
Washington, DC 20037
(202) 457-6000
Fax: (202) 457-6315
john.burlingame@squirepb.com
katy.spicer@squirepb.com
meghan.quinn@squirepb.com

*Counsel for Defendant*

2

**MEMORANDUM IN SUPPORT**

Although Dr. Pohar has previously been permitted to testify at trial, his evolving and novel opinions in these cases, the unsubstantiated bases for them, and the recent amendments to Fed. Rule of Evidence 702 should give this Court serious pause about the reliability of his current opinions.  Specifically, Dr. Pohar does not properly account for and rule out GCNIS as a *causal* risk factor for Mr. Hall's and Mr. Lynn's germ cell testicular cancer, even while he expressly acknowledges that both Plaintiffs had germ cell testicular cancer.  Despite the lack of scientific evidence, contrary to Dr. Pohar's prior testimony, and without regard to EMO 1 (holding that Plaintiff's expert could not testify that C-8 operates synergistically with obesity to cause cancer), Dr. Pohar now claims that C-8 acted in conjunction with GCNIS in causing the evolutionary steps of each Plaintiff's germ cell testicular cancer in these cases.  DuPont respectfully requests that this Court exercise its gatekeeping function to strike these opinions and preclude Dr. Pohar from opining on specific causation at trial.

**RELEVANT BACKGROUND**

**A. Germ Cell Neoplasia in Situ is a Well-Established Cause of Germ Cell Testicular Cancer.**

Germ cell cancers, the type of testicular cancer that both Mr. Hall and Mr. Lynn had, are "known to be distinct from almost all other cancers," but "[m]ales are, by far, most commonly affected (90-95%) with the testis being the most common organ of origin." January 19, 2024 Expert Report of Craig Nichols, MD, FASCO, FACP for Plaintiff Joseph Hall [Ex. 1] ("Nichols *Hall* Report") at p. 12; *see also* January 19, 2024 Expert Report of Craig Nichols, MD, FASCO, FACP for Plaintiff Ian Lynn [Ex. 2] ("Nichols *Lynn* Report") at p. 12-13.

Most germ cell cancers are caused by GCNIS, a "common precursor of all seminomas and most adult non-seminomatous germ cell tumours of the testis." *Germ cell neoplasia in situ*, WHO Classification of Tumours, Urinary and Male Genital Tumours, (5th ed. 2022) [Ex. 3]. Testicular cancers are broadly split into tumors derived from GCNIS and those unrelated to GCNIS. *See* WHO Classification of Tumours, Urinary and Male Genital Tumours, (5th ed. 2022) [Ex. 4]. "It is the global consensus that GCNIS is the "well-known obligate precursor of adult testicular cancer." Feb. 23, 2024 Deposition of Kamal S. Pohar ("Pohar Dep.") [Ex. 5] at 175:18-21 (citing Feb. 2, 2024 Rebuttal Report of Kamal Pohar for Ian Lynn [Ex. 6]).; *see also* Feb. 2, 2024 Rebuttal Report of Kamal Pohar for Joseph Hall [Ex. 7] (similar); *see also* Nichols *Hall* Report [Ex. 1] at 36 and Nichols *Lynn* Report [Ex. 2] at 35 (describing GCNIS as "the precursor lesion to invasive type II post-pubertal germ cell cancer.").  Dr. Pohar has testified that "a man who has GCNIS in the testicle doesn't invariably develop testicular cancer, but the large majority will."  Feb. 5, 2020 Trial Tr. [*Abbott*, No. 2:17-cv-00998, ECF No. 195] at 149:11-13; *see also id.* at 149:14-16 ("[I]t's very likely that a man has a high probability of developing an invasive malignancy if they have GCNIS.").  Importantly, "GCNIS itself is not cancer,"  (Nichols *Hall* Report [Ex. 1] at 16, Nichols *Lynn* Report [Ex. 2] at 17; *see also* Feb. 5, 2020 Trial Tr. [*Abbott*, No. 2:17-cv-00998, ECF No. 195] at 149:23 (Dr. Pohar stating "[i]t's not a cancer")), but instead, as Dr. Pohar testified, it is "a premalignant lesion that could lead to cancer."  Feb. 5, 2020 Trial Tr. [*Abbott*, No. 2:17-cv-00998, ECF No. 195] at 149:23-24.

Dr. Pohar concedes, as he must, that if a patient has GCNIS, there is a high likelihood that the patient will develop germ cell testicular cancer, even without C-8 exposure.  *See* Pohar Dep. [Ex. 5] at 128:18-22 ("A. If someone has histologic proof of having GCNIS in their testicle, they're at significant risk of developing testicular cancer, yes, regardless of the mechanism that led to that

phenotype."); *see also* Nichols *Hall* Report [Ex. 1] at 37, Nichols *Lynn* Report [Ex. 2] at 35-36 ("nearly all patients with GCNIS will develop invasive type II germ cell cancer in the post puberty period"). Both Mr. Hall and Mr. Lynn had GCNIS and were diagnosed with germ cell testicular cancer. Nichols *Hall* Report [Ex. 1] at 10-11; Nichols *Lynn* Report [Ex. 2] at 10-11; *see also* Pohar Rebuttal Reports [Ex. 6, 7] at 3 (acknowledging that "[i]t would be expected that any man diagnosed with germ cell cancer will have GCNIS in the testicle and is a unifying theme regardless of the case"; further describing both men's cancers as "invasive germ cell cancer"); Pohar Dep. [Ex. 5] at 58:21-22 ("the overwhelming majority of germ cell cancers pass through GCNIS").

**B. Both Plaintiffs Had Germ Cell Testicular Cancer.**

Plaintiff Joseph Hall alleges that his testicular cancer resulted from exposure to C-8 via contaminated water in the City of Little Hocking, Ohio and the Little Hocking Water Association ending in 2005. Hall Compl. [*Hall*, No. 2:23-cv-00869-EAS-EPD, ECF No. 1] ¶ 8. Plaintiff Ian Lynn alleges that his testicular cancer resulted from exposure to C-8 via contaminated water in the City of Belpre, Ohio and the Little Hocking Water Association ending in 2005. Lynn Compl. [*Lynn*, No. 1:22-cv-00751-EAS-EPD, ECF No. 1] ¶ 8; *see also* Dec. 15, 2023 Expert Report of David MacIntosh for Ian Lynn [*Lynn*, No. 1:22-cv-00751-EAS-EPD, ECF No. 20-2] at 8.

Mr. Hall was born in 1966 in Parkersburg, West Virginia. Mr. Hall's relevant claimed exposure to C-8 lasted from 1999-2005, allegedly beginning when his mother gifted him property in Little Hocking Ohio. Amended Plaintiff Fact Sheet for Joseph Hall ("Am. Hall PFS") [Ex. 8 (to be filed under seal)] at p. 3; Oct. 3, 2023 Deposition of Joseph Hall ("Hall Dep.") [Ex. 9] at 26:3-5.[1] Mr. Hall testified that he initially brought water from his mother's house to his own in

---

[1] DuPont reserves all rights regarding contesting class membership.

containers, but in 2004 eventually installed a water line that connected his house to the tap water in Little Hocking. Hall Dep. [Ex. 9] at 26:16-21; 29:11-12.

Mr. Hall's testicular cancer first presented in the fall of 2021. *See* Hall Dep. [Ex. 9] at 102:9-13. In February of 2022, he underwent a right radical orchiectomy and was diagnosed with germ cell testicular cancer. Am. Hall PFS [Ex. 8] at p. 7. He elected surveillance and has not experienced any sign of reoccurrence. Hall Dep. [Ex. 9] at 118:24-119:1-20.

Plaintiff Ian Lynn was born in Parkersburg, West Virginia, in February of 1977. Amended Plaintiff Fact Sheet for Ian Lynn ("Am. Lynn PFS") [Ex. 10 (to be filed under seal)] at p. 2. He spent the majority of his early childhood in Little Hocking, Ohio, where he obtained water from a private well. *Id*. at p. 5; *see* October 4, 2023 Deposition of Ian Lynn ("Lynn Dep.") [Ex. 11] at 22:12-23. In 1988, he moved to Cutler, Ohio. Am. Lynn PFS [Ex. 10] at p. 3. Ten years later, he moved to Belpre, Ohio, where he began working as a boilermaker. *Id.* Finally, in 2002, Mr. Lynn moved to Vincent, Ohio, where he currently resides. *Id.* Mr. Lynn claims that he was exposed to C-8 via contaminated drinking water at his residences in Belpre, Cutler, and Vincent. *Id.* at p. 5. In the spring of 2021, Mr. Lynn began to experience testicular tenderness. Lynn Dep. [Ex. 11] at 27:4-9. In May 2021 he underwent an orchiectomy and was diagnosed with germ cell testicular cancer. Am. Lynn PFS [Ex. 10] at pp. 6-7.

Both Plaintiffs were treated by Dr. Michael Sweeney for their germ cell testicular cancer, and Dr. Matthew Macatol reviewed their pathology slides. Both plaintiffs' pathology reports are silent as to the presence or absence of GCNIS.

4

**LEGAL STANDARD**

I.    **Plaintiffs Bear the Burden of Demonstrating that Dr. Pohar's Opinions are Admissible.**

Plaintiff bears the burden of demonstrating by a preponderance of the evidence that Dr. Pohar's opinions are admissible. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).  Under Rule 702, as amended in December 2023, a witness' testimony is only admissible:

*if the proponent demonstrates to the court that it is more likely than not that*:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; *and*
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis added).  A plaintiff can only meet this burden by "objective, independent validation of the expert's methodology; the expert's bald assurance of validity is not enough." *Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 303 (6th Cir. 1997) (abrogated on other grounds) (citation omitted); *see also Gales v. Allenbrooke Nursing and Rehab. Ctr., LLC*, 91 F.4th 433, 437 (6th Cir. 2024) ("FRE 702 requires more than simply 'taking the expert's word for it'" (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments)).

In December 2023, Rule 702 was "'amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely true than not that the proffered testimony meets the admissibility requirements set forth in the rule.'" *North Dakota v. United States*, No. 1:19-CV-00150, 2024 WL 708864, at *1 (D.N.D. Feb. 8, 2024) (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendments).  The Advisory Committee noted that this change was necessary because "many courts have held that the critical

5

questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," which reflects "an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendments. The Advisory Committee further observed that "the language of the amendment more clearly empowers the court to pass judgment on the conclusion that the expert has drawn from the methodology." *United States v. Briscoe*, No. 20-CR-1777 MV, 2023 WL 8096886, at *4 (D.N.M. Nov. 21, 2023) (quoting May 15, 2022 Report of the Advisory Committee on Evidence Rules).

Because expert testimony "can be both powerful and quite misleading," district courts must act as gatekeepers to ensure that expert testimony "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 592; *Thomas v. Novartis Pharms. Corp.*, 443 F. App'x 58, 60 (6th Cir. 2011) ("Under *Daubert* and its progeny, district courts must exercise a gatekeeping role in screening the reliability of expert testimony to keep 'junk science' away from juries."). Federal Rule of Evidence 702 embodies this *Daubert* principle by only permitting an expert witness to offer opinions that are "reliable"—meaning based on sound scientific reasoning and methodology. *See* Fed. R. Evid. 702. If an expert does not employ sound scientific reasoning and methodology, the expert's testimony is mere *ipse dixit* and inadmissible. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

To determine whether expert testimony is reliable, the court must "make certain that an expert. . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996) (noting that under *Daubert*, a court must "distinguish between real and courtroom science"). To meet this burden,

6

the expert's opinions must reflect "scientific knowledge. . . derived by the scientific method," representing "good science." *See Daubert*, 509 U.S. at 590, 593.

District courts consider numerous factors in determining whether an expert's opinions reflect "good science," including "whether an expert developed his opinions for the purposes of testifying." *Adams v. Cooper Indus.*, No. 03-476-JBC, 2007 U.S. Dist. LEXIS 55131, at *16 (E.D. Ky. July 30, 2007); *see also Kolesar v. United Agri Prods.*, 412 F. Supp. 2d 686, 697 (W.D. Mich. 2006) (rejecting opinion of expert witness because "her hypothesis [had] all the appearances of a conclusion made for convenience (to support a pre-existing notion) rather than one supported by scientific fact").

## ARGUMENT

Dr. Pohar's purported differential diagnosis contains fundamental errors that should preclude his testimony and opinions from being admitted at trial. Without the backing of any scientific support, Dr. Pohar concocted an unsupported theory that Plaintiffs' "testicular cancer progressed through the sequential neoplastic lesion of GCNIS before becoming an invasive germ cell cancer, but it was [their] exposure to C8 that was a substantial contributing factor in causing the evolutionary steps of [each Plaintiff's] testicular cancer." Pohar Rebuttal Reports [Ex. 6,7] at 3.

An expert rendering a differential diagnosis must "(1) objectively ascertain[], to the extent possible, the nature of the patient's injury, (2) "rule[] in" one or more causes of the injury using a valid methodology, and (3) "engage[] in 'standard diagnostic techniques by which doctors normally rule out alternative causes' to reach a conclusion as to which cause is most likely." *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 179 (6th Cir. 2009). "[S]imply claiming that an expert used the 'differential diagnosis' method is not some incantation that opens the *Daubert*

7

gate." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010) (quoting *Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1360 (M.D. Ga. 2007)). Where an expert's efforts "turn[] on speculation, not a valid methodology . . . the testimony does not satisfy Rule 702." *Id*.

In 2020, Dr. Pohar embraced the well-established science that GCNIS is a cause of germ cell testicular cancer separate and apart from C-8. "[A] man who has GCNIS in the testicle doesn't invariably develop testicular cancer, but the large majority will." Feb. 5, 2020 Trial Tr. [*Abbott*, No. 2:17-cv-00998, ECF No. 195] at 149:11-13; *see also id.* at 149:14-16 ("[I]t's very likely that a man has a high probability of developing an invasive malignancy if they have GCNIS."). Even in his rebuttal reports in these cases, Dr. Pohar observed that "[i]t is true, *the evolution of [each plaintiff's] testicular cancer progressed through the sequential neoplastic lesion of GCNIS* before becoming an invasive germ cell cancer. . ." Pohar Rebuttal Reports [Ex. 6, 7] at 3 (emphasis added).

But Dr. Pohar runs afoul of Rule 702 by disregarding GCNIS as a causal risk factor and claiming—without identifying any basis in science, and counter to his prior testimony—that "…it was [each plaintiff's] exposure to C8 that was a substantial contributing factor in ***causing the evolutionary steps*** of his testicular cancer." *Id*. (emphasis added).[2] To be sure, Dr. Pohar in his rebuttal report and deposition tried to assert, for the first time, that C-8 acts synergistically with GCNIS in causing germ cell testicular cancer by "causing influences" on GCNIS. Pohar Dep. [Ex.

---

[2] Dr. Pohar's reports also apply an incomplete standard for proximate cause. Proximate cause is "an act or failure to act that was a substantial factor in bringing about an injury *and without which the injury would not have occurred*." *See, e.g.*, Jury Instructions [*Abbott*, No. 2:17-cv-00998-EAS-EPD, ECF No. 244] at Instruction No. 21 (emphasis added). While Dr. Pohar's reports conclude that "it was [each plaintiff's] exposure to C8 that was a substantial contributing factor in causing the evolutionary steps of his testicular cancer," Pohar Rebuttal Reports [Ex. 6, 7] at 3, they are silent as to the remainder of the relevant inquiry: whether Plaintiffs' cancer would not have occurred without exposure to C-8.

5] at 96:16-98:2. Other than a passing reference to the Science Panel report, Dr. Pohar does not rely on peer-reviewed science (and he certainly cites none in any report he has issued in these cases). He instead resorts to his own *ipse dixit* in an effort to mask his failure to properly rule out the "obligate precursor" to both Plaintiffs' testicular cancer.[3] Dr. Pohar's failure to reliably rule out GCNIS, and his novel theory that C-8 somehow works in conjunction with GCNIS such that C-8 was a "substantial contributing factor" in causing each Plaintiff's cancer, is inadmissible under Rule 702.

I. **Dr. Pohar Confused Diagnosis and Clinical Management with Causation to Improperly Exclude GCNIS as the Most Likely Cause of Plaintiffs' Germ Cell Cancer.**

"[M]ost treating physicians have more training in and experience with diagnosis than etiology." *Tamraz*, 620 F.3d at 673. But "[t]he ability to diagnose medical conditions is not remotely the same . . . as the ability to deduce . . . in a scientifically reliable manner, the causes of those medical conditions. Doctors thus may testify to both, but the reliability of one does not guarantee the reliability of the other." *Id.* at 673-74 (internal quote marks and citation omitted).

Dr. Pohar's reports for both Mr. Hall and Mr. Lynn accept the presence of GCNIS as a well-established causal risk factor for germ cell testicular cancer. December 15, 2023 Expert Report of Kamal Pohar for Joseph Hall [*Hall*, No. 2:23-cv-00869-EAS-EPD, ECF No. 15-1] at 5; December 15, 2023 Expert Report of Kamal Pohar for Ian Lynn [*Lynn*, No. 1:22-cv-00751-EAS-EPD, ECF No. 20-1] at 6. Dr. Pohar then purported to rule out the presence of GCNIS as a possible cause of their cancer, without explaining how he did so. *See id.* (finding generally that plaintiffs

---

[3] Following Dr. Pohar's deposition, DuPont wrote Plaintiffs requesting that Dr. Pohar identify any and all peer-reviewed research he claims to have relied on for his conclusions regarding the specific causes of testicular cancer. *See* March 15, 2024 Letter from Katy Spicer to Jon Conlin on Outstanding Discovery ("March 15, 2024 Letter") [Ex. 12]. Plaintiffs have not produced any supporting documentation from Dr. Pohar.

9

"had none of the risk factors for developing testicular cancer"). Both Mr. Hall and Mr. Lynn undisputedly had germ cell testicular cancer, and Dr. Pohar acknowledged in his rebuttal reports that "**[i]t would be expected that any man diagnosed with germ cell cancer will have GCNIS in the testicle and is a unifying theme regardless of the case.**" Pohar Rebuttal Reports [Ex. 6, 7] at 3 (emphasis in original). It logically follows that, as men "diagnosed with germ cell cancer," both Mr. Hall's and Mr. Lynn's germ cell testicular cancer "progressed through the sequential neoplastic lesion of GCNIS before becoming an invasive germ cell cancer . . . ." *Id.* Dr. Pohar confirmed this at deposition. *See* Pohar Dep. [Ex. 5] at 58:15-25 (agreeing that Mr. Lynn's diagnosis indicated a "GCNIS-derived germ cell tumor"); *id.* at 103:16-25 (agreeing that Mr. Hall's diagnosis was a "GCNIS-derived germ cell tumor"). While Dr. Nichols concluded the same (Nichols *Hall* Report [Ex. 1] at 10-11, Nichols *Lynn* Report [Ex. 2] at 10-11), Dr. Pohar attempts to discount Dr. Nichols' conclusion as one made solely for "academic purposes." Pohar Rebuttal Reports [Ex. 6, 7] at 3. But it is Dr. Pohar who confuses causation of cancer with diagnosis and management, contending that "there is no clinical relevance to a pathologist reporting the presence or absence of GCNIS when there is a known primary testicular tumor as it has no bearing on clinical management." *Id*.

Mr. Lynn undisputedly had GCNIS.[4] As Dr. Thomas Ulbright, a world-renowned pathologist whose practice focuses on testicular neoplasia, observed in connection with his review of Mr. Lynn's slides: "Although not commented on by [Mr. Lynn's original pathologist] Dr.

---

[4] Mr. Hall's pathology slides were not available for review, but well-founded, peer-reviewed science demonstrates that his germ cell testicular cancer was GCNIS-derived. *See, e.g.*, Nichols *Hall* Report [Ex. 1] at 10-17. Dr. Pohar likewise opined that "essentially all adult males diagnosed with germ cell cancer have associated GCNIS[.]" Pohar *Hall* Rebuttal Report [Ex. 7] at 2. Accordingly, he cannot rule out the presence of GCNIS absent evidence supporting that conclusion.

Macatol, I noted that there was germ cell neoplasia in situ (GCNIS) in the residual seminiferous tubules of the testis." *See* January 19, 2024 Expert Report of Thomas Ulbright, MD [Ex. 13] at 4.

Dr. Pohar also reviewed Mr. Lynn's pathology slides without disclosing his review in his report. *See* Pohar Ex. 17, Mr. Lynn's Pathology Chain of Custody [Ex. 14]. Dr. Pohar conceded at deposition that he reviewed the pathology slides. Pohar Dep. [Ex. 5] at 17:4-10 ("I did look at the slides for Mr. Lynn"); *see also id.* at 165:1-2 ("I saw the slides. Of course I did."). When asked if he saw GCNIS, he testified that he is "not an expert at finding GCNIS, so I didn't look for GCNIS. I'm not an expert at looking for GCNIS, and it wasn't – it wasn't relevant for me to look for GCNIS." *Id.* at 167:19-23. He also testified that, although he has experienced pathologists at his disposal in connection with his professional practice, he did not use them because "it wouldn't change [his] reports in any way." *Id.* at 168:18-169:8.

Dr. Pohar's attempt to explain away his statement that the presence of GCNIS is a risk factor for testicular cancer in these cases fails under Fed. R. Evidence 702. When faced with the indisputable facts that Mr. Lynn had GCNIS and that both Plaintiffs' germ cell cancer progressed through GCNIS, Dr. Pohar claimed that he "was referring to the rare clinical situation that a man has a testicular biopsy and GCNIS was detected but he has no evidence of a germ cell cancer." Pohar Rebuttal Reports [Ex. 6, 7] at 3. This biopsy is "a tool for detection of GCNIS," not a determination of causation. Ewa Rajpert-De Meyts et al., *Optimized Detection of Germ Cell Neoplasia in Situ in Contralateral Biopsy Reduces the Risk of Second Testis Cancer,* 130 BJU Int'l 646 (2022), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9796833/ (last accessed Apr. 5, 2024); Mohit Gupta et al., *Diagnosis and Management of Intratubular Germ Cell Neoplasia in Situ: A Systematic Review*, 204 J. Urology 33 (2020), available at https://www.auajournals.org/doi/10.1097/JU.0000000000000758 (last accessed Apr. 5, 2024).

11

On its face, Dr. Pohar's argument makes no sense. According to him, GCNIS is a cause of testicular cancer only if it has not yet caused the cancer. If GCNIS is found after it has caused germ cell testicular cancer, Dr. Pohar would ignore it as the cause. Dr. Pohar confused diagnosis with causation and improperly excluded an established cause of testicular cancer based on the lack of a particular diagnostic test that is "a very uncommon scenario in North America," where such biopsies are not usually performed. Pohar Rebuttal Reports [Ex. 6, 7] at 3.

Dr. Pohar's disregard for GCNIS as a risk factor and his confusion between diagnosis of GCNIS and causation renders his causation opinions unreliable and inadmissible.

II.     **Dr. Pohar's Speculation Regarding GCNIS and C-8 is Inadmissible and Contradicts His Prior Testimony in this MDL.**

Dr. Pohar attempted to salvage his specific causation opinion by injecting a novel, untested, and certainly scientifically unproven theory that C-8 affected the evolution of GCNIS to testicular cancer in these cases. *See* Pohar Dep. [Ex. 5] at 96:16-98:2.

In *Abbott*, Dr. Pohar was asked whether C-8 causes GCNIS, and clearly agreed that he could not "state to a reasonable degree of medical certainty that C-8 causes GCNIS." *See* Feb. 5, 2020 Trial Tr. [*Abbott*, No. 2:17-cv-00998, ECF No. 195] at 161:16-162:4:

Q. Is it your testimony, sir, that C-8 causes GCNIS?

A. It's not my testimony that it causes it. We don't have fundamental knowledge about how C-8 directly modulates cellular programs, causes genetic influences and leads to a tumor. It could be prepubertal or it could be post-pubertal or it could be both.

Q. Fair enough.

Can we agree then that you can't state to a reasonable degree of medical certainty that C-8 causes GCNIS?

A. No, it causes testicular cancer.

Q. Correct, I completely agree with that. But I want to know whether you can state to a reasonable degree of medical certainty that C-8 causes GCNIS?

12

A. No.

He further testified that "GCNIS is a non-cancerous precursor lesion to germ cell cancer[.]" *Id.* at 149:3-5.  Dr. Pohar additionally testified that "it's very likely that a man has a high probability of developing an invasive malignancy if they have GCNIS." *Id.* at 149:14-16.

In 2024, Dr. Pohar testified for the first time that C-8 "causes influences" on GCNIS and acts synergistically with other, undisclosed factors to impact GCNIS:

> Q.  Dr. Pohar, you would agree that C-8 doesn't cause GCNIS, correct?
>
> A.  I mean, GCNIS is part of the evolution of testicular cancer, so where the exposure – the carcinogen is causing influences.  You know, it's – you know, GCNIS is part of the testicular cancer spectrum, so it certainly would be a contributing factor to the evolution of testicular and the development of testicular cancer.
>
> Q.  Dr. Pohar, C-8 doesn't cause GCNIS, does it?
>
> MR. CONLIN: Objection; asked and answered.
>
> A. The Science Panel determined that C-8 is a probable link to testicular cancer, so it causes – it's a cause of testicular cancer.  There's an evolution, though of cancer through different, you know, through different – like the vast majority of malignancy, there's an evolution, so it's all part of the evolutionary process of cancer.
>
> Q. What would – so you – so tell me what literature says that C-8 causes GCNIS.
>
> A.  You can't say that, but you can't say it's a risk factor for any cancer.  I mean, it's an evolutionary process, and the output of the evolutionary process is the diagnoses invasive phenotype, but there's an evolutionary spectrum to a cancer; so, you know, the carcinogen or the underlying risk factor is contributing and causing the whole process of cancer development, so you're not going to know something that's histologic, not clinically relevant, not clinically detectable.  The output is what you get clinically, in terms of the diagnosis.

Pohar Dep. [Ex. 5] at 96:16-98:2.  Dr. Pohar went on to say that "[s]omething caused the GCNIS. The GCNIS didn't just come out of the blue on its own to cause testicular cancer." *Id.* at 99:14-16.

After trying to articulate his new theory, Dr. Pohar was unable to explain *how* C-8 impacts the evolution of GCNIS to testicular cancer. *See id*. at 133:19-25 ("Q. But sitting here today, you cannot explain how C-8 impacts the evolutionary step in how GCNIS develops into testicular germ cell cancer, correct? MR. CONLIN: Objection to form. Q. That's correct, correct? A. That's true."). As for scientific support, Dr. Pohar identified only the Science Panel's report, and its finding of a probable link between C-8 and testicular cancer, as a basis for his opinion. *See id.* at 132:15-19 ("Q. And what are you basing that on – what's the – A. The Science Panel."). But there is nothing in the Science Panel's report associating C-8 exposure to the development of the non-cancerous lesion GCNIS. Dr. Pohar was unable to identify any scientific literature that remotely supports the notion that C-8 impacts the evolution of GCNIS into testicular cancer. *See id.* at 97:13-98:2; *see also* March 15, 2024 Letter [Ex. 12] at 1-2.

Dr. Pohar conceded in his rebuttal reports that "[i]n over 90% of post-pubertal germ cell cancers, GCNIS is found in the surrounding normal testicular parenchyma, both seminoma and non-seminoma, and is the ***well-known obligate precursor of adult testicular cancer***." Pohar Rebuttal Reports [Ex. 6, 7] at 3 (emphasis added). And his new theory contradicts Dr. Pohar's prior testimony, his written reports, and the overwhelming weight of scientific evidence.

An expert's causation opinion is not admissible where "it is not supported by any evidence or medical literature[.]" *See McCarty v. Arch Wood Prot., Inc*., No. CV 11-109-HRW, 2016 WL 1306067, at *3 (E.D. Ky. Mar. 31, 2016); *see also* Fed. R. Evid. 702(b) and (c). At deposition, Dr. Pohar stated that there were "more than a hundred articles, far more than a hundred, that I think are relevant to my thought process and thinking when I was formulating this report." Pohar Dep. [Ex. 5] at 39:15-18. He excused his failure to identify any of these articles because he considered it "fundamentally my knowledge base." *Id*. at 39:21-22.

14

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254-55 (6th Cir. 2001). Plaintiffs' affirmative specific causation opinions must consist of more than their expert's own *ipse dixit*, buttressed only by a passing reference to the Science Panel's report. Ultimately, Dr. Pohar's speculative theory as to a link between C-8 and GCNIS does not come close to meeting *any* of the four factors set forth in Fed. R. Evid. 702, let alone all of them. His litigation-inspired opinion is unsupported by any scientific literature. As this Court has previously found, an expert's opinion that C-8 acts "synergistically" with other risk factors to cause cancer should be excluded. *See* EMO 1 at 27-29 (striking portion of Plaintiff's expert report opining that Plaintiff's obesity acted synergistically with C-8 to have effect on Plaintiff's cancer). Dr. Pohar's opinions amount to exactly this and are properly excluded.[5]

## CONCLUSION

An expert conducting a differential diagnosis in the specific causation context must follow a standard, scientifically accepted methodology to determine the "most likely" cause of a condition. *Best*, 563 F.3d at 179. That methodology cannot consist of a preordained conclusion that the most likely cause of a condition is the cause a party needs to advance their position; it must be based on sound science and reject the temptation to speculate or craft new theories to support a litigation-driven position. *Tamraz*, 620 F.3d at 674.

---

[5] While not the focus of this brief, Dr. Pohar also ignored the important issues of latency, lag time, and half-life looming over Plaintiffs' claims. Dr. Pohar did not consider the half-life of C-8 in rendering his opinion, testifying that he did not "have the knowledge to calculate half lives," Pohar Dep. [Ex. 5] at 182:6-14, and that it would be "impossible" to determine any sort of latency or lag times for Plaintiffs, *id*. at 70:5-10. DuPont reserves all rights to seek exclusion of Dr. Pohar on these grounds pending the Court's determination on DuPont's pending Brief Regarding Deposition Objections [ECF No. 5470].

But Dr. Pohar did just that, changing gears from his prior testimony in this MDL and ignoring well-established science undercutting the position he was retained to provide to give new, scientifically unsupported testimony that contradicts his prior opinions.  His statement that C-8 "causes influences" on GCNIS has no basis in any scientific literature or in the Science Panel's report.

For the reasons set forth above, and in the interests of justice, DuPont respectfully requests that the Court exclude Dr. Pohar's inadmissible, unhelpful, and unsound specific causation opinions, and for all other relief the Court deems just and proper.

Dated:  April 9, 2024

Respectfully submitted,

*/s/ Jesse L. Taylor*
Jesse L. Taylor (0088209) (Trial Attorney)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700
Fax: (614) 365-2499
jesse.taylor@squirepb.com

John A. Burlingame (admitted *pro hac vice*)
Katy A. Spicer (admitted *pro hac vice*)
Meghan A. Quinn (admitted *pro hac vice*)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street NW
Washington, DC 20037
(202) 457-6000
Fax: (202) 457-6315
john.burlingame@squirepb.com
katy.spicer@squirepb.com
meghan.quinn@squirepb.com

*Counsel for Defendant*

16

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing was electronically filed with this Court's CM/ECF system on this 9th day of April, 2024 and accordingly served automatically upon all counsel of record for this matter.

/s/ Jesse L. Taylor
Jesse L. Taylor (0088209)
Attorney for Defendants