UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE NEMOURS
AND COMPANY C-8 PERSONAL
INJURY LITIGATION

Case No. 2:13-md-2433
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth A. Preston Deavers

**This document relates to:**
*Joseph and Donna Hall v. E. I. du Pont de Nemours and Co., et al.,* Case No. 2:23-cv-869

**DISPOSITIVE MOTIONS ORDER**

**Motion for Summary Judgment on *Leach* Class Membership**
(***Hall*, Case No. 2:23-cv-869, ECF No. 21**)

This matter is before the Court on a Motion for Summary Judgment on *Leach* Class Membership filed by Plaintiffs Joseph and Donna Hall. (Mot., ECF No. 21.) Defendant E.I. Du Pont de Nemours and Company ("DuPont") opposes (Resp., ECF No. 44), and Plaintiffs filed a reply (Reply, ECF No. 58). For the reasons stated below, the Motion is **GRANTED.**

**I. BACKGROUND**

The Court assumes the reader's familiarity with this multi-district litigation ("MDL") that began in 2013 as a result of DuPont's discharge of C-8, or perfluorooctanoic acid (PFOA), into the Ohio River, landfills, and air surrounding its plant in West Virginia. Thus, the Court provides only the background information necessary to understand the issues raised in Plaintiffs' Motion. A comprehensive account of the history surrounding DuPont's discharges of C-8 and the lengthy litigation that has ensued is available in *In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 54 F.4th 912, 916–21 (6th Cir. 2022), *cert. denied sub nom. E. I. du Pont de Nemours & Co. v. Abbott*, 144 S. Ct. 16, 217 L. Ed. 2d 229 (2023).

### A. The Halls and Their Lawsuit

Mr. Hall and his spouse, Mrs. Hall, brought this action on March 3, 2023. (Compl., ECF No. 1.) They allege that Mr. Hall resided and worked in at least one of the contaminated water districts including the City of Little Hocking, Ohio and Little Hocking Water Association, Ohio ("LHWA") in or around 1999 and consumed water contaminated with C-8 at greater than .05 ppb for at least a year before December 3, 2004. (*Id.* ¶ 8.) As a result of his water consumption, Plaintiffs allege Mr. Hall was diagnosed with testicular cancer on February 10, 2022, and sustained severe and permanent personal injuries, pain, suffering, and emotional distress. (*Id.* ¶ 9.)

Plaintiffs brought causes of action against DuPont[1] for negligence; concealment, misrepresentation, and fraud; negligent and intentional infliction of emotional distress; punitive damages; and loss of consortium. (*Id.* ¶¶ 157–204.) Since the complaint was filed, Plaintiffs filed a notice of dismissal under Federal Rule of Civil Procedure 41(a)(1)(A) of Plaintiffs' claim for concealment, misrepresentation, and fraud. (ECF No. 7.) Because the notice did not dismiss all claims, the Court construed the notice as a joint motion to sever under Federal Rule of Civil Procedure 21, granted the motion, and dismissed the second cause of action without prejudice. (ECF No. 9.)

### B. The *Leach* Class Action and Settlement

This Court summarized the *Leach* class action and settlement in Dispositive Motions Order ("DMO") No. 1 (Main MDL, Case No. 2:13-md-2433, ECF No. 1679):

> On August 31, 2001, a group of individuals filed a state court action in West Virginia against [DuPont] captioned *Leach v. E. I. du Pont de Nemours & Co.,* No. 01-C-698 (Wood County W. Va. Cir. Ct.) *("Leach* Case"). The plaintiffs in the *Leach* Case brought a variety of claims under West Virginia common law tort theories for equitable, injunctive and declaratory relief, along with compensatory and punitive damages, as a result of alleged drinking water contamination.

---

[1] The parties jointly moved to dismiss without prejudice Defendant The Chemours Company (ECF No. 17), and the Court granted that motion (ECF No. 18).

2

On April 10, 2002, the West Virginia trial court ("*Leach* Court") granted the plaintiffs' motion for class certification and certified a mandatory, non-opt-out class

> on behalf of a class of all persons whose drinking water is or has been contaminated with ammonium perfluorooctanoate (a/k/a/ "C-8") attributable to releases from DuPont's Washington Works plant (hereinafter "the Class") with respect to all issues relating to [DuPont's] underlying liability and Plaintiffs' claims for equitable, injunctive, and declaratory relief, including liability for punitive damages; all damage issues involving any determination of individual harm of the Class members and the amount of any punitive damages are hereby STAYED and RESERVED for later litigation . . . .

*Leach v. E.I. Du Pont de Nemours & Co.*, No. 01-C-608, 2002 WL 1270121, at *1 (W. Va. Cir. Ct. Apr. 10, 2002). The class included approximately 80,000 individual residents of the communities served by certain public water districts and private water sources that had allegedly been contaminated with C-8 discharged from DuPont's Washington Works plant.

In November 2004, the parties entered into a class-wide settlement of the *Leach* Case ("*Leach* Settlement Agreement"). On February 28, 2005, following appropriate class-wide notice, objection opportunities, full opt-out opportunities, and a final fairness hearing, the *Leach* Court entered a final order approving the *Leach* Settlement Agreement.

In the *Leach* Settlement Agreement, the parties fashioned a unique procedure to determine whether the approximately 80,000 individual class members would be permitted to file actions against DuPont based on any of the human diseases they believed had been caused by exposure to C-8. The procedure required DuPont and the plaintiffs to jointly select three completely independent, mutually-agreeable, appropriately credentialed epidemiologists ("Science Panel") to study human disease among the residents exposed to C-8 by the discharges from DuPont's Washington Works plant. *(Leach* Settlement Agreement "S.A." at §§ 12.2.1, 12.2.2; ECF No. 520-8.) The *Leach* Settlement Agreement defines the task as follows:

> The Science Panel shall develop and approve, by a vote of at least two members of the Science Panel, a protocol for a study of Human Disease among residents exposed to C-8 in the communities served by the Public Water District and Covered Private Sources and shall have the responsibility for conducting such study in accordance with such protocol (the "Community Study").

(S.A. § 12.2.2.)

Pursuant to the *Leach* Settlement Agreement, the parties chose the Science Panel, which established a protocol and studied numerous human diseases. The

3

Agreement provided that the results of the Science Panel's study would be issued in either a "Probable Link Finding" or a "No Probable Link Finding" for each human disease the Panel studied. (S.A. § 12.2.3.)

In 2011 and 2012, the Science Panel delivered Probable Link Findings for the following human diseases ("Linked Diseases"): kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, diagnosed high cholesterol (hypercholesterolemia), and pregnancy-induced hypertension and preeclampsia. The *Leach* Settlement Agreement defines "Probable Link Finding" as follows:

> "Probable Link" shall mean that based upon the weight of the available scientific evidence, it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members.

(S.A. § 1.49.)

Also in 2011 and 2012, the Science Panel delivered No Probable Link Findings for the human diseases of rheumatoid arthritis, lupus, type 1 diabetes, Crohn's disease, multiple sclerosis, Parkinson's disease, liver disease, stroke, osteoarthritis, attention deficit disorders and learning disabilities in children, chronic kidney disease, asthma, chronic obstructive airways disease, common infections such as influenza, thyroid cancer, liver cancer, pancreatic cancer, breast cancer, prostate cancer, melanoma, preterm birth or low birth weight, miscarriage or stillbirth, and birth defects.

Because the Science Panel delivered a Probable Link Finding as to the six Linked Diseases, the *Leach* Settlement Agreement permits the individual class members to pursue the claims "for personal injury and wrongful death, including but not limited to any claims for injunctive relief and special, general and punitive and any other damages whatsoever associated with such claims, that . . . relate to exposure to C-8 of Class Members" and DuPont agreed not to contest general causation in those actions. (S.A. § 3.3.) DuPont retained the right to contest specific causation and to assert any other defenses not barred by the *Leach* Settlement Agreement. Section 3.3 of the Agreement provides in relevant part:

> Upon delivery of any Probable Link Finding to the Administrator, Defendant [DuPont] agrees that, in any personal injury or wrongful death action brought by, on behalf of, or otherwise pertaining to a Class Member, Defendant [DuPont] will not contest the issue of General Causation between C-8 and any Human Disease(s) as to which a Probable Link Finding has been delivered, but reserves the right to contest Specific Causation and damages as to any individual Class Member or plaintiff and to assert any other defenses not barred by this Agreement. . . .

(S.A. § 3.3.)

The parties defined general and specific causation as follows:

4

> "General Causation" shall mean that it is probable that exposure to C-8 is capable of causing a particular Human Disease.
>
> . . . .
>
> "Specific Causation" shall mean that it is probable that exposure to C-8 caused a particular Human Disease in a specific individual.
>
> (S.A. §§ 1.25, 1.60.)

(DMO No. 1, PageID 22974–77 (footnotes omitted).) The Court also explained in DMO No. 1 that to show class membership:

> [B]oth sides agree, and this Court finds, that as part of the individual plaintiffs' cases they must show that they have one or more of the Linked Diseases. To prove class membership, a plaintiff must show that he or she, "for the period of at least one year," has "consumed drinking water containing .05 ppb or greater of C-8 attributable to release from [DuPont's] Washington Works" plant from any of the "six specified Public Water Districts" or any of the Covered Private Sources named in the *Leach* Settlement Agreement. (S.A. §2.1.1.)

(DMO No. 1, PageID 22980.)[2] Such consumption must have taken place before December 4, 2004. (*See* Mot. PageID 400; Resp. PageID 4391.)

### C. Mr. Hall's Water Consumption

The parties dispute whether Mr. Hall drank LHWA water enough days to qualify as a *Leach* class member. LHWA is one of the Public Water Districts covered by the *Leach* Settlement Agreement. (S.A., Schedule 2.1.1(A).)Though somewhat technical and tedious, information about exactly where Mr. Hall was living and from what source he was consuming water at various times during his life is relevant to resolving this Motion.

180 Ross Road was Mr. Hall's primary residence during the relevant time. Prior to having that address, the property's address was Rt. 1 Box 49C, Little Hocking, Ohio. (MacIntosh Am. Ex.

---

[2] Plaintiffs state that to qualify as a *Leach* class member, an individual must consume water for "more than one year," but that differs from the plain language of the *Leach* Settlement Agreement. (Mot. PageID 402.)

5

Rep., ECF No. 21-7, PageID 499–500.) The address was changed to 180 Ross Road when the 911 emergency alert system became operational in the region.[3] (*Id.*) The property at Rt. 1 Box 49B, Little Hocking, OH 45742 was the main residence of Terri Carpenter,[4] Mr. Hall's mother. (ECF No. 21-8.) Similarly, that address changed to 163 Ross Road when the 911 emergency alert system began operation.[5] The 180 Ross Road property and the 163 Ross Road property were between 300 and 500 yards apart. (*Compare* Mot. PageID 404, *with* MacIntosh Am. Ex. Rep. PageID 500.)

Mr. Hall testified that he moved to the 180 Ross Road property "by the end of 1999." (Mr. Hall Dep., ECF No. 21-3, 25:23–26:7.) At first, Mr. Hall lived in a mobile home that did not have running water while he was building his permanent home. (*Id.* 26:10–24; 30:8–12.) During that time, he obtained water by transporting it from his mother's home at 163 Ross Road. (*Id.*) Mr. Hall stated during his deposition that his mother received her water from LHWA, that he filled up his water "maybe twice a week," and that he would bring six one-gallon jugs to fill up each trip. (*Id.* 28:7–29:5.) The parties dispute how Mr. Hall transported the water between the properties, but such facts are immaterial. (*See* Mot. PageID 404; Resp. PageID 4394.) When asked during which years he carried the water, Mr. Hall answered that "[i]t was into 2000," although he did not recall specifically, but that he "finally got the well water line and tap in" sometime around then. (*Id.* 29:8–12.)

Plaintiffs produced documents (although, late) that corroborate Mr. Hall's testimony.[6] Mr.

---

[3] For ease of reference, the Court collectively refers to these addresses as "180 Ross Road."
[4] Terri Carpenter was also referred to as Terri Stewart in documents that are part of the record. (*See, e.g.*, MacIntosh Am. Ex. Rep. PageID 501; ECF No. 21-8.)
[5] For ease of reference, the Court collectively refers to these addresses as "163 Ross Road."
[6] Since this Motion was filed, the Court issued a decision on DuPont's Motion to Exclude Plaintiffs' Untimely Fact Evidence and Amended Expert Reports from Dr. David MacIntosh, which the parties discuss in the instant briefing. (ECF No. 64.) DuPont asked the Court to exclude Dr. MacIntosh's Amended Expert Reports and supporting documents—which were served after expert discovery deadlines—arguing Dr. MacIntosh had employed a new methodology that included fact gathering after his deposition and materially changed his opinions. (ECF No. 31.) The Court denied that

Hall's mother's property was assigned the account number 09-14270, and Customer Master File Maintenance documents indicate LHWA began supplying her property on November 27, 1996. (ECF No. 58-1, PageID 4888.)

A Tap Sheet shows that a tap was set somewhere on the properties on October 7, 1999. (ECF No. 21-8.) The tap number was 8529. (*Id.*) The Sheet lists the customer as Terri Stewart and includes her corresponding address (Rt. 1 Box 49B). (*Id.*) The account number listed, however, is 09-1428, and that account number matches the account number on Mr. Hall's later-dated Customer Master File Maintenance documents for 180 Ross Road (09-14280). (ECF No. 21-5, PageID 431.) Those documents indicate the "starting date" for Mr. Hall's water service was January 13, 2004. (*Id.*) A Water Users Agreement between LHWA and Mr. Hall, however, shows the Agreement was "[t]ransferred from Terri Carpenter" to Mr. Hall on that same date, indicating the property was already being serviced by LHWA, but the account was transferred from Terri Carpenter's name to Mr. Hall's name. (*Id.* PageID 442–448.) The tap numbers and account numbers are the same on the Tap Sheet and Water Users Agreement. (ECF Nos. 21-8, ECF No. 21-5, PageID 442–448.)

Mr. Hall testified during his deposition that he finished building his home in 2001, and it was serviced by LHWA at that time. (Hall Dep. 32:14–19.) Mr. Hall lived at 180 Ross Road until 2015. (*Id.* 33:9–16.)

There were gaps in Mr. Hall's residency at 180 Ross Road though. During Dr. MacIntosh's[7] interview of Mr. Hall, Mr. Hall told Dr. MacIntosh that, in 2000, he began working for a company

---

Motion, and did not exclude the *Hall* Amended Expert Report, supporting fact documents, and corresponding testimony. (ECF No. 64.) The Court allowed DuPont to reopen discovery for a short time to depose Dr. MacIntosh only as to new information included in his *Hall* Amended Expert Report. (*Id.*)

[7] DuPont challenges the admissibility of this interview and the interviews Dr. MacIntosh conducted of Mr. Hall's family members. (*See, e.g.*, Resp. PageID 4393.) Although the Court summarizes information from the interviews, it makes no finding on the admissibility of those interviews.

7

called Highway Transport as a local delivery driver and worked out of Marietta, Ohio. (MacIntosh Am. Ex. Rep. PageID 503.) Marietta is about 20 miles northeast of Little Hocking. (*Id.*) Mr. Hall was in that role for about 8 months and then accepted a manager role at the company's Anmoore, West Virginia office, which was about 75 miles from Little Hocking. (*Id.*) Rather than commuting daily, he stayed overnight in Anmoore for 2 to 4 nights per week. (*Id.*)

Later, Mr. Hall was "in Nashville for a few months" with Highway Transport after the company closed its Anmoore facility. (Hall Dep. 40:1–13; MacIntosh Am. Ex. Rep. PageID 503.) He did not recall exactly how long he was in Nashville other than "[i]t was a very short period of time . . . right before 9/11" and that it was "less than six months." (*Id.*) Mr. Hall told Dr. MacIntosh that he returned to 180 Ross Road two or three weeks after the September 11, 2001 terrorist attacks. (MacIntosh Am. Ex. Rep. PageID 503–04.) Mr. Hall testified about other gaps as well, but they were after December 3, 2004—in other words, they were after the relevant time frame for the *Leach* class membership analysis. (Hall Dep.)

Mr. Hall told Dr. MacIntosh that, upon his return to 180 Ross Road, he worked as a product manager for a company in Marietta and joined the Little Hocking Volunteer Fire Department. (MacIntosh Am. Ex. Rep. PageID 504.) In August 2002, he began employment as a truck driver with Waste Management based in Parkersburg, West Virginia. (*Id.* (citing Hall Dep. 62).)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set

8

forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

### III. ANALYSIS

The Court begins with what the parties do not dispute: they do not dispute that Mr. Hall has a Linked Disease (testicular cancer) under the *Leach* Settlement Agreement. (Probable Link Evaluation of Cancer, ECF No. 5470-2.) They do not dispute that LHWA is one of the six Public Water Districts specified under the *Leach* Settlement Agreement. (S.A., Schedule 2.1.2(A).) They also do not dispute that Mr. Hall consumed LHWA water from January 13, 2004 to December 3, 2004, which amounts to at least 325 days. (ECF Nos. 21-5, 21-6; *see* Resp. PageID 4392; Reply PageID 4877.)

Given these undisputed facts, Mr. Hall needs 41 additional[8] days of Public Water District exposure before December 4, 2004 to qualify as a *Leach* class member. The parties *do* dispute whether Mr. Hall has established that there is no issue of material fact as to those 41 days. (*See* Mot.

---

[8] Plaintiffs use 41 days in their Motion, so the Court uses 41 days. (Mot.) Under the plain language of the *Leach* Settlement Agreement, 40 days would be sufficient.

9

PageID 4877.)

Construing the evidence in a light most favorable to DuPont, no genuine issue of material fact exists that Mr. Hall did not consume LHWA water for at least one year. DuPont focuses on the gaps in Mr. Hall's residence at 180 Ross Road. DuPont contends that Plaintiffs seek to fill in most of those gaps through Dr. MacIntosh's interviews with Mr. Hall and his family, which are unsworn.

From the end of 1999 until late 2001, Mr. Hall's permanent residence was at 180 Ross Road, but he was traveling and sometimes staying away overnight during the workweek in connection with his profession. There was also about a six-month period in 2001 when Mr. Hall lived in Nashville, Tennessee for his work. But even assuming for purposes of this analysis that Mr. Hall did not consume LHWA water before the fall of 2001 (even though he testified that he did), DuPont cannot avoid Mr. Hall's testimony that he finished building his home in 2001, his home was serviced by LHWA, and in the fall of 2001, during all of 2002, and during all of 2003, he was living full-time at 180 Ross Road, consuming LHWA water. Mr. Hall easily clears the 41-day hurdle.

DuPont points to Mr. Hall's Customer Master File Maintenance documents to contend that Plaintiffs' evidence shows 180 Ross Road received LHWA water beginning on January 13, 2004. (Resp. PageID 4394.) Mr. Hall's testimony during his deposition contradicts that conclusion, as does other evidence from Plaintiffs.

The Tap Sheet indicates that a tap was set on October 7, 1999, for account 09-1428, which matches the account number on Mr. Hall's later-dated Customer Master File Maintenance documents for 180 Ross Road. While Mr. Hall's mother's name and address is listed on the Tap Sheet, other documents indicate her property was assigned account number 09-14270 and that water service on her property began on November 27, 1996. Further, the Water Users Agreement indicates water service was merely transferred from Terri Carpenter's name to Mr. Hall's name on January 13, 2004. (ECF No. 21-5, PageID 442–48.) Collectively, this evidence indicates that by the fall of 2001,

10

Mr. Hall was drinking LHWA water on his property at 180 Ross Road.

Even if 180 Ross Road did not receive a water tap until January 13, 2004, as DuPont contends, the evidence still shows that Mr. Hall was living at 180 Ross Road full time after the fall of 2001. The only other water he could have been consuming based on his testimony was water from LHWA at his mother's property next to his.

Plaintiffs have met their burden of proving there are no genuine issues of material fact as to Mr. Hall's *Leach* class membership. The burden shifts to DuPont to set forth specific facts showing there is a genuine issue for trial. DuPont has not met its burden.

### IV. CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment on *Leach* Class Membership is **GRANTED.** (ECF No. 21.) The Clerk is directed to file this Dispositive Motions Order in *Hall*, Case No. 2:23-cv-869, only.

**IT IS SO ORDERED.**

<u>8/1/2024</u>             <u>s/Edmund A. Sargus, Jr.</u>
**DATE**            **EDMUND A. SARGUS, JR.**
           **UNITED STATES DISTRICT JUDGE**